## Chicago House Wrecking Co. v. A. Durand.

1. INSTRUCTIONS—*That Because Plaintiff Mentioned Purpose for Which He Bought Materials Defendant Warranted Them for Such Purpose.*—An instruction to the jury that even though they found that the goods purchased were the identical goods selected, and were in every respect equal to the samples from which they had been purchased, still if they were not fit for the purpose for which defendant said at the time he ordered them he intended to use them, that in such case the plaintiff had a right to refuse to accept them, is not proper, for the reason that it assumes to tell the jury that because plaintiff may have mentioned that the material he was purchasing was for a house, the jury must understand that the defendant warranted the material for such purpose.

**Assumpsit.**—Appeal from the Superior Court of Cook County; the Hon. FARLIN Q. BALL, Judge presiding. Heard in the Branch Appellate Court at the October term, 1901. Reversed and remanded. Opinion filed December 30, 1902.

O'DONNELL & BRADY, attorneys for appellant.

ALDEN, LATHAM & YOUNG, attorneys for appellee.

MR. JUSTICE BURKE delivered the opinion of the court.

The declaration in this case consists of the common counts and also of a special count, averring a special contract by the terms of which the plaintiff bought of the defendant a large quantity of lumber, hardware and other building material, the freight prepaid to Blackwell, Oklahoma Territory; that the plaintiff paid the sum of $765 in advance, but that the defendant never shipped the material. The case was tried before the court and a jury and resulted in a verdict and judgment for $926.25 in favor of appellee.

The appellee, A. Durand, was a resident of Blackwell, Oklahoma Territory. He first learned of appellant company by seeing an advertisement in some farm newspaper; he wrote to the company stating that he intended to build a house, and asked for a catalogue, which was sent to him. Appellant was engaged in the business of purchasing entire stocks of material from sheriffs', receivers', manufacturers' and trustees' sales; and in February, 1899, the company wrote to Durand requesting him to send a full list of the materials he would need in the construction of his house, promising to quote him its lowest prices. Durand took the catalogue received from appellant to his contractors and had them make a list of materials he would need in erecting the cottage. Durand then sent the list to the Chicago House Wrecking Company, and requested it to put a price on the different articles. Appellant returned to him a copy of this list, with the prices marked opposite the articles, on or about February 22, 1899. Durand came to Chicago on the 12th or 13th day of March, 1899, and went to appellant's place of business at Thirty-fifth and Iron streets, where he was introduced to Mr. Newmann, a salesman in the employ of appellant. Durand had with him the said list of materials and prices and after looking through appellant's yards and the different stores of materials he came back to Newmann and said, " You have nothing here in lumber that I want. Your lumber is old stuff. I want nothing but new stuff in the building." Mr. Newmann replied, " Mr. Durand, we get all our stuff from the lumber yard over across the railroad—the Thomson lumber yard." Durand and Newmann went over to the Thomson lumber yard to see the material and Newmann pointed out piles of new lumber material necessary for the erection of the house except doors and windows, which he said they did not keep on hand, but which they had manufactured at a sash and door factory. Durand was not satisfied with the flooring, ceiling, lapsiding and shingles which Newmann at first pointed out. Newmann then showed him a better grade and also raised

the prices on the list which Durand had in his hand. The windows and doors were also to be new and Newmann said that they would be manufactured at the sash and door factory and he quoted Durand prices from the catalogue which the latter had with him. The next day, Tuesday, March 14th, Durand, for the material they had talked about the day before, agreed to pay the price of $765, which Durand then paid to the Chicago House Wrecking Company.

Through various delays, the causes of which are not very clearly shown, it was not until the fore part of May that two cars containing a lot of building material assigned to Durand were pulled onto a switch-track at Blackwell, Oklahoma Territory. Durand was notified and went to the station with teams to haul the material away but found that $192 for freight was due on the shipment and that he could not take it away unless the same was paid. The material as loaded on the two cars was in plain view. Durand describes it as follows: "The lumber was all mixed up. The scantling was full of nails and burnt ends of boards and dirt. Some doors had had glass in but the glass was broken out. The lime barrels were all busted and scattered over the cars, and so were the nails. The locks were all mixed up." Durand declined to pay the freight. On May 1, 1899, he received from appellant the following telegram: "The freight is paid." On May 3, 1899, Durand received telegram from appellant: "We will pay freight." However, appellant did not pay the freight until some time in July, and so Durand could not have gotten the material even if he had been willing to accept it. In July, 1899, the cars were unloaded by the railroad company. Several witnesses on behalf of Durand testified that the material was defective, of a very low grade, and unfit for use in building a house. They substantially agreed with the statements of Durand. The defense does not deny that the material shipped was of the kind, grade and condition described by plaintiff's witnesses, nor does it deny that the freight had not been paid as

provided in the contract of purchase and that the same was not paid until about three months after the material was shipped. But appellant introduced much evidence to show that the material shipped consisted of the identical articles selected by Durand. Durand denies that any material was ever pointed out to him as being his, or even that any particular piles were pointed out as being the ones from which his material would be selected.

The conflict of evidence in this case is so great that the instructions of law must be found to be correct, otherwise the judgment can not stand. The following instruction of law marked "Fifth," was read to the jury:

"Fifth. The court instructs the jury that where chattels are to be made or supplied to the order of the purchaser, there is an implied warranty that they are fit for the especial purpose intended by the buyer, if that purpose be communicated to the vendor when the order is given; and in this case, if you believe from the evidence that the plaintiff ordered certain goods and chattels from the defendant with which to build a house, and that the plaintiff told the defendant at the time he ordered said goods the purpose for which he intended to use the same, and that at the time said order was given the said goods and chattels had not been made or separated from the bulk or set apart to the plaintiff, and if you further find from the evidence that the goods and chattels which the defendant shipped to the plaintiff were not fit for the purposes intended by the plaintiff, then the court instructs you that the plaintiff had a right to refuse to accept said goods and chattels."

Counsel for appellee in stating appellee's theory of the case say that no specific chattels were agreed upon or sold to appellee, but that the material he was to get was to correspond in kind, description and fitness to the samples that had been shown to him; and yet counsel insists, notwithstanding this, that because appellee made the statement that this material was to be used in the erection of a cottage that therefore the material to comply with the contract must be fit for the erection of a cottage. We can not subscribe to such a proposition without qualifications. It may well be said that appellee was not a competent person to select a sample for building materials which should be fit

for the erection of a house.   Under plaintiff's evidence and counsel's theory of the case appellee ought not to recover unless the evidence shows that he did not receive the materials which corresponded in kind, description, and fitness to the samples that had been shown him.   From plaintiff's evidence it appears that he had no idea that an express warranty had been given him; and in fact the skilled pleaders who drew the declaration in this case had no thought of declaring upon an express warranty for they have failed so to do.   This judgment of $926.25 can not be sustained if recovered under any one of the common counts.   If recovered for money had and received, there is no evidence on which to base so large an amount.

So that if the judgment can be sustained it must be under the special count.   But this count is only to recover the purchase price of a large quantity of building material for which appellee bargained and paid in advance but which appellant failed to deliver; and also damages for breach of the contract.   It certainly can not be said that there is anything in this count which, under any state of the evidence, would justify a verdict and judgment in any amount because of a failure in express warranty, for the count is not framed upon a theory which will allow a recovery under an express warranty.

Now, in view of the state of the pleadings what relevancy to the case had the fifth instruction?   By reading the fifth instruction to the jury the court said to them that even though they found that the goods purchased were the identical goods selected and were in every respect equal to the samples from which they had been purchased, still if they were not fit for the purpose for which defendant said at the time he ordered them he intended to use them, that in such case the plaintiff had a right to refuse to accept them.   The instruction is not proper under the evidence of the case, and is erroneous for the further reason, that it assumes to tell the jury, that, because appellee may have mentioned that the material he was purchasing was for a house, the jury must understand that the appellant war-

ranted the material for such purpose. This instruction should not have been given. Besides the objections to it already stated it tended to divert the minds of the jury from the issues made by the pleadings and by the evidence. As the judgment must be reversed and the case retried, we refrain from expressing an opinion on the evidence or any part thereof. Judgment of the Superior Court is reversed and the cause remanded.